MORRIS NEMMO, ET AL., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 41427 and 42452.[1]   Filed June 30, 1955.

*Sol Goodman, Esq.*, for the petitioners.[2]

*R. G. de Quevedo, Esq.*, and *Lyman G. Friedman, Esq.*, for the respondent.

---

[1] The proceedings which have been consolidated herein are : Docket Nos. 41444 and 48466, Samuel Tucker ; Docket Nos. 41445 and 46488, Ruby Kolod ; Docket Nos. 41490 and 46577, George Gordon ; Docket Nos. 41491 and 46573, Alfred Goltsman ; Docket No. 41639, Charles A. Polizzi ; Docket No. 42372, Albert R. Masterson ; Docket No. 42373, Albert R. Masterson and Kathryn Masterson ; Docket No. 42616, Morris Nemmo and Velma Nemmo ; Docket No. 42674, Abe Schneider and Sarah Schneider ; Docket No. 42768, Freda Bregel Stager, Transferee : Docket No. 42769, Estate of George Bregel, deceased, Freda Bregel, Executrix, and Freda Bregel (now Stager), individually ; Docket No. 42770, Freda Bregel Stager ; Docket No. 43245, Estate of Claude M. Hines, Jr., deceased, Mary Hines, Administratrix, and Mary Hines, individually ; Docket No. 43246, Estate of Claude M. Hines, Jr., deceased, Mary Hines, Administratrix ; Docket No. 43340, Maurice A. Ryan and Zoe Ryan ; Docket No. 43341, Maurice A. Ryan ; Docket No. 43682, Fred Hallam and Freda Hallam ; Docket No. 43683, Fred Hallam ; Docket No. 43828, Samuel Gutterman ; Docket No. 43829, Samuel Gutterman and Martha Gutterman ; Docket No. 46489, Ruby Kolod and Esther Kolod ; Docket No. 46574, Alfred Goltsman and Minnie Goltsman ; Docket No. 46576, George Gordon and Mildred Gordon ; Docket Nos. 46716, 46717, 46718, Max S. Gladstone, Transferee.

[2] The petitioners' co-counsel who appeared at the trial of these proceedings are as follows : Morris Weintraub, Esq. ; Eugene Meacham, Esq. ; Daniel W. Davies, Esq. ; Edw. T. Dixon, Esq. ; Geo. J. Kaufmann, Esq. ; and Thos. D. Hirschfeld.

OPINION.

Harron, *Judge:* The principal question to be decided is whether the respondent correctly determined that the petitioners understated their distributive shares of income from the Yorkshire Club, a partnership, in each of the taxable years. Also to be decided is whether the respondent correctly determined that the petitioners are liable for penalties and additions to tax under the provisions of sections 293 (b) and 294 (d) of the 1939 Code. Several of the petitioners have also raised the 3-year statute of limitations, section 275 (a) of the Code, as a bar to the deficiencies determined for 1946, 1947, and 1948.

Under the general issue, the narrow question is whether the Yorkshire, in the course of its bookmaking activities, paid out to winning bettors the amounts claimed in the computation of its reported net income. The parties are in agreement as to each petitioner's percentage interest in the Yorkshire profits, and the respondent has made no adjustment to the partnership's income other than the disallowance of a portion of the hits claimed in its bookmaking operations.

The respondent's determination that the Yorkshire did not sustain hits in excess of 88 per cent of play, or conversely, that the partnership realized a gross profit of 12 per cent on all wagers placed, is prima facie correct, and the petitioners have the burden of proving that the respondent's determination was erroneous. The respondent's disallowance of all hits in excess of 88 per cent of play is predicated upon the partnership's asserted failure to maintain records adequate to substantiate the hits. Specifically, the respondent points to the destruction of the back-up sheets containing carbon copies of the information written by the clerks on the individual betting tickets. In dealing with a comparable situation, this Court has said:

True, petitioner had destroyed the sixty-line sheets and thus has made the Commissioner's task of auditing the returns immeasurably more difficult than it should be. This is conduct that is not to be condoned. Perhaps the Treasury should seek and the Congress should provide it with appropriate and effective sanctions, civil or criminal or both, against taxpayers who fail to keep or who do away with important records bearing on their liability. But, under the law as it now stands we are not empowered to approve deficiencies merely because records have been destroyed. Of course, the destruction of records is a factor that may be taken into account in various circumstances such as the determination of fraud, and it may justify the Commissioner in using some reasonable method of reconstructing a taxpayer's income, with the burden upon the taxpayer to show that the Commissioner is in error. * * *

*H. T. Rainwater*, 23 T. C. 450, 456.

We have found as facts on the basis of the entire record that the Yorkshire's bookmaking operation sustained hits in excess of 88 per cent of play during the taxable years, and that the hits sustained are correctly recorded in the partnership's retained books and records. These records consist of the daily summary sheets of bookmaking activity, which were prepared, usually by Robert Clark, from the sheet writers' carbon back-up sheets; the partners' summary sheets of all gambling activity, the bookmaking data which was taken from Clark's summary sheets; and the journal and ledger entries made by Kuresman, the accountant, from the two sets of summary sheets. Basically, the issue is the reliability and accuracy of the daily summaries of bookmaking activity, since no discrepancies in the hit totals appear as these figures were successively transcribed first to the partners' sheets and then to Kuresman's books.

The question is one of fact, and must be decided on the weight of the evidence adduced. Cf. *Jack Showell*, 23 T. C. 495; *H. T. Rainwater*, *supra*. Clark, who was a salaried employee without any interest in the partnership's earnings, testified at length as to each step leading to the completion of his daily summary sheet. He distributed the $6,000 bankroll each day among the sheet writers, physically supervised the activities of the sheet writers while they wrote bets and made payoffs on hits, and totaled the cash they turned in at the end of each day as an additional check on the accuracy of the back-up sheets. There is no evidence in the record indicating, as suggested by respondent, that the sheet writers may have falsified the back-up sheets, or that they may have written tickets on winning horses after a race had been run. Clark further testified that after he verified his play and hit totals by counting the cash turned in by the sheet writers, he carefully and honestly transcribed the play and hit totals to his summary sheet. We have carefully considered his testimony and his demeanor, and conclude that his testimony is credible and should be believed. The reliability of Clark's summary sheets also is indicated by the partners' acceptance of his figures as the basis on which they disbursed cash to him to replenish his $6,000 bankroll, in the event of a losing day, and accepted cash from him, on a winning day.

The explanation offered at the hearing of these proceedings and on brief for the increases in partnership income determined by the respondent is that the Yorkshire could not substantiate any of the hits shown on its records, and, pursuant to the rule in *Cohan* v. *Commissioner*, 39 F. 2d 540, 88 per cent of play was determined by respondent to be a reasonable allowance for hits. The agent or agents of the respondent who determined that the 88 per cent allowance was "reasonable" did not testify in these proceedings, and the record does not establish how this percentage was determined, except that the agent's report referred to 86 per cent as the percentage of gross bets which is returned to bettors as payoffs on winning bets at Churchill Downs, Kentucky. The agent's report was furnished to the partnership. The evidence establishes that the operations of a track do not provide a reasonable comparison for the determination of a bookmaker's profits. The eventual winner of a race is of no concern to the track. The track removes its percentage from the total fund wagered, regardless of the winner, and then distributes the balance of the wagers to winning bettors.[4] On the other hand, the bookmaker is not guaran-

---

[4] In states where the track is required to make a minimum payoff to winning bettors, the track will actually sustain a loss on a race in the event a disproportionately large portion of the wagers is placed on the eventual winner. The evidence indicates this is not a frequent occurrence.

teed any percentage of profit or even that he will have any profit; the amount of payoffs he will be required to make is not limited to a portion of the wagers he has accepted, but is dependent upon the amount of wagers he has accepted on the eventual winner. See *H. T. Rainwater, supra*, pp. 456–7. Furthermore, the Yorkshire accepted bets on various tracks throughout the country, depending, each day, on the information being furnished by the wire service.

Even apart from a consideration of the operations at Churchill Downs, we think the record establishes that the 12 per cent gross win figure determined by the respondent is erroneous and cannot be sustained. The respondent's expert witness, Edward J. Price, Chief Auditor for the Nevada Tax Commission, testified that bookmaking was legal in Nevada during the taxable years and that bookmakers in Nevada, paying track odds without limitation, realized an average gross profit of about 8.6 to 8.8 per cent of wagers accepted. Price admitted on cross-examination, however, that bookmakers in Nevada may not take bets after post time, and that a bookmaker certainly runs some danger of losing by accepting such late bets. Price at first claimed that he could not give an opinion as to whether a bookmaker allowing such practices would experience the same percentage of profit as the Nevada average, but later admitted that a bookmaker who accepts all bets until the horses are at the first quarter is running a "charitable institution" and would naturally have a lower percentage of profit than the Nevada average. Price also admitted that a bookmaker "foolish enough" to accept lay-off bets or big bets at the last moment would possibly be "stuck" on some occasions; and that a bookmaker who has no opportunity to either handicap bets or lay-off bets is "certainly a Godsend to the rest of the business" and could not continue operating for any length of time. These factors were all present in the Yorkshire's bookmaking operations: a large part of the wagers were accepted after a race had started and until the horses had reached the first quarter, as an accommodation to the clients of the casino's gambling games. It is pertinent to note, in this connection, that the partnership's solicitude for the patrons of the casino does not appear to have been without a good purpose. As set forth in the Findings of Fact, the partnership reported net winnings of $2,980,694 during the taxable years from the games in the casino. This amount is many times larger than the reported winnings from the horse operation, and even considerably in excess of the bookmaking profit as redetermined by the respondent. Also, H. R. S., the bookmaking partnership with which the Yorkshire's lay-off bets were placed, sometimes refused these lay-off bets because it was too late for H. R. S. in turn to lay off the bets elsewhere, and the amount of lay-off bets placed by the York-

shire was insignificant in comparison to the total wagers it accepted. On this state of the evidence, we think the 12 per cent margin determined by the respondent is unreasonable and bears no relation to the operations of the Yorkshire during the taxable years; and further, that there is no basis in the record for applying the 8.6 or 8.8 per cent margin purportedly realized by Nevada bookmakers, or any other percentages, to redetermine the partnership's income from bookmaking.

The evidence indicates that an adjustment should be made to the partnership income to reflect the retention and use by the bookmaking operation of bettors' uncollected winnings. Winning wagers were marked as hits when the racing results became known, regardless of whether or how soon the bettor appeared to collect his winnings. Although the unclaimed winnings were put aside by Clark for payment to claimants, the partnership controlled and used the funds as its own in restoring cash shortages which developed in the $6,000 bookmaking bankroll. The partnership kept its books on the cash basis, and under these circumstances, it was improper to treat the unclaimed winnings as hits in computing bookmaking profit. The evidence indicates that the failure to claim winnings was not a frequent occurrence and that the amounts involved were small. Using our best judgment on the evidence before us, we have found that these unclaimed winnings did not exceed $2,000 in each of the taxable years.

The respondent determined 50 per cent penalties for each of the taxable years in each of the consolidated proceedings, under the provisions of section 293 (b). The respondent has the burden of proving that part of any deficiency is due to fraud with intent to evade tax, and the evidence necessary to establish fraud must be clear and convincing. *Snell Isle, Inc.* v. *Commissioner*, 90 F. 2d 481, certiorari denied 302 U. S. 734; *Wiseley* v. *Commissioner*, 185 F. 2d 263. We conclude from the entire record that respondent has not discharged this burden, and our finding of fact is dispositive of this issue. In each of these proceedings, a small deficiency results from the adjustment to the Yorkshire's income referred to above. The deficiencies will be larger in several of the consolidated cases as a result of stipulations entered into by the parties, or the failure of petitioners to allege error in other of the adjustments determined by respondent. As indicative of fraud, the respondent points to the admittedly deliberate destruction or disposal of the individual back-up sheets, which contained the details of the wagers accepted by the bookmaking operation. The disposal of these records properly raises a suspicion that the partnership intended to conceal the true facts concerning the amount of hits sustained. On the other hand, the bookmaking operation, of which the back-up sheets constituted evidence, was illegal

under state law,[5] and the disposal of the back-up sheets is equally suggestive of the desire to avoid seizure by police authorities of evidence pertaining to the unlawful activity. Even more significant is the circumstance that respondent's agents, in auditing the partnership returns for years prior to the taxable years, made no objection to the absence of the back-up sheets. Under these circumstances, we do not consider the destruction of the back-up sheets as clear and convincing evidence that part of the deficiencies were due to fraud.

Several of the petitioners have pleaded the 3-year statute of limitations, section 275 (a) of the 1939 Code, as a bar to the deficiencies determined by the respondent for 1946, 1947, and 1948. In three of these proceedings, Docket Nos. 43341, Maurice A. Ryan (for 1947 and 1948); 43683, Fred Hallam (1947); and 43246, Estate of Claude M. Hines, Jr. (1948), we have found that, within 3 years after the time the returns were filed or were due, see section 275 (f), the petitioners executed consent agreements extending the period for assessment, and that the statutory notices of deficiency were mailed within the extended period. In Docket No. 43246, the consent agreement was executed by the petitioner's decedent and the latter's wife. We hold that the respondent's determinations in the foregoing proceedings are not barred by the statute of limitations. In Docket No. 41639, Charles A. Polizzi, petitioner's pleadings affirmatively allege that the notice of deficiency for 1948 was mailed on March 11, 1952, within 3 years of the date the return was due. Sec. 275 (f). Accordingly the statute of limitations does not bar respondent's determination for 1948 in this proceeding. In the other proceedings, in which the statute of limitations has been pleaded, the deficiency notices were mailed more than 3 years and less than 5 years from the later of the filing date or due date of the return, or within the extended period provided in consents which were executed by the petitioners more than 3 years and less than 5 years from the later of the filing or due date of the return. These proceedings are: For the year 1946, Docket Nos. 41444, Samuel Tucker; 41445, Ruby Kolod; 41490, George Gordon; 41491, Alfred Goltsman; 41639, Charles A. Polizzi; 43341,

[5] Kentucky Revised Statutes (1946, 1948 eds.):

Chapter 436. OFFENSES AGAINST MORALITY.—436.490 [1328a] Betting on or transmitting bets on horse races other than authorized Kentucky races. (1) Any person who, either for himself or as agent or employee of another, wagers money or anything of value on a horse race run or about to be run or advertised, posted or reported as being run at any race track in or out of this state, or who engages in the occupation of receiving, making, transmitting or negotiating, either in person or by messenger, telephone or telegraph, wagers on horse races run or about to be run or advertised, posted or reported as being run at any race track in or out of the state, shall, except in the case of wagers made within the enclosure of a race track licensed by the State Racing Commission during an authorized race meeting at that track, or an enclosure during regular meetings in which running, trotting, or pacing races are being conducted by associations regularly organized for that purpose, be imprisoned for not less than one nor more than twelve months.

See also 436.440 [3914b–1; 3914b–3] and 436.450 [3914b–2].

Maurice A. Ryan; and 43683, Fred Hallam; for the years 1946 and 1947, Docket No. 43246, Estate of Claude M. Hines, Jr.; for the year 1947, Docket Nos. 46488, Ruby Kolod; 46573, Alfred Goltsman; 46577, George Gordon; and 48466, Samuel Tucker; and for the year 1948, Docket Nos. 46489, Ruby Kolod and Esther Kolod; 46574, Alfred Goltsman and Minnie Goltsman; and 46576, George Gordon and Mildred Gordon. In each of these proceedings, the respondent claims that the deficiency notices and consent agreements [6] were timely under the 5-year statute of limitations provided in section 275 (c) of the Code.[7] For section 275 (c) to be applicable, the taxpayer must have omitted from gross income an amount in excess of 25 per cent of the gross income reported. A decision under Rule 50 is required by our holding on the principal issue and also to give effect to certain stipulations entered into by the parties. Accordingly, the parties will, under Rule 50, compute the amounts and percentages of gross income omitted by the respective petitioners, in order that the applicability of section 275 (c) in each proceeding may be ascertained, and the parties will, under Rule 50, make application of the provision of section 275 (c) where proper. The parties can agree upon the application or the nonapplication of section 275 (c).

It is the understanding of the Court that the issues relating to the additions to tax determined by the respondent under the provisions of section 294 (d) will be disposed of under Rule 50.

*Decisions will be entered under Rule 50.*

---

[6] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

SEC. 276. SAME—EXCEPTIONS.

(b) WAIVER.—Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

[7] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

(c) OMISSION FROM GROSS INCOME.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.