57 Herkimer Street Corporation v. Commissioner. Bessie Brouse Nelson v. Commissioner.
57 Herkimer St. Corp. v. Commissioner
Docket Nos. 64531, 64532.
United States Tax Court
T.C. Memo 1961-223; 1961 Tax Ct. Memo LEXIS 126; 20 T.C.M. (CCH) 1100; T.C.M. (RIA) 61223; August 9, 1961
Paul Arnold, Esq., and Richard Z. Steinhaus, Esq., for the petitioners. Charles B. Markham, Esq., and Samuel B. Sterrett, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in income tax and additions to tax: Additions to Tax Under Section
Docket No.
Year
Deficiency
293(b) [1]
294(d)(1)(A)
294(d)(2)
64531
1946
$ 13,621.78
$ 6,915.17
1947
13,933.73
7,391.75
1948
12,103.39
6,051.70
1949
14,375.00
7,187.50
1950
11,488.71
5,744.36
1951
13,181.30
6,590.65
1952
11,594.78
5,797.39
1953
5,840.11
2,920.06
Total
$ 96,138.80
$48,598.58
64532
1946
$ 13,664.93
$ 6,832.97
$ 883.38
1947
21,798.71
11,063.20
1,201.86
1948
20,835.79
10,417.90
$1,799.64
1,199.75 *
1949
16,518.48
8,259.24
854.31
1950
22,376.40
11,861.29
2,018.16
1,345.43 *
1951
25,818.31
12,909.16
2,200.64
1,467.09 *
1952
37,845.81
18,922.91
3,424.14
2,282.75 *
1953
6,459.19
3,229.60
505.73
337.15 *
Total
$165,317.62
$83,496.27
$9,948.31
$9,571.72
*128 The principal issues for our determination are whether either the corporate or the individual petitioner or both failed to report income for the years 1946-1953, inclusive, and if so, whether such failures were due to fraud with intent to evade tax. Dependent on the fraud issues is the question whether the years 1946-1948 are barred by the statute of limitations. Petitioners' main defense to the above issues is that the corporation sustained embezzlement losses in each year in the precise amounts of its alleged unreported income by reason of the conversion of receipts by the corporation's agents, and therefore could not and did not pass them on to the individual petitioner. Respondent's original answer alleged fraud in failure to report monies received from re-rental of rooms. By amended answer, he alleged simply failure to report rental income; consequently we must *129 decide whether respondent has properly raised the issue of fraud with respect to all types of rentals. An unrelated issue, pertaining to the individual petitioner only, is whether her payment of premiums on various life insurance policies (on the lives of herself and her minor son) in the years 1948-1953 from a trust created under the will of her deceased husband for the benefit of said son (said petitioner being a co-trustee) rendered petitioner taxable on the amounts so paid. Further issues are: (1) Whether the individual petitioner is liable for the additions to tax on account of substantial underestimation imposed by section 294(d)(2) for the years 1946, 1947 and 1949; and (2) whether her failure to file an estimated tax return for the years 1948, 1950-1953 is due to reasonable cause and not to willful neglect so as to render her liable for an addition to tax under section 294(d)(1)(A). Findings of Fact Background Some of the facts have been stipulated and are so found. To the extent not included below they are incorporated herein by this reference. The corporate petitioner, 57 Herkimer Street Corporation (hereinafter referred to as "corporation"), was organized under *130 the laws of New York in 1926. Its sole business activity is the operation of the Kismet Arms Hotel (hereinafter referred to as "hotel") in Brooklyn, New York. It filed its Federal income tax returns for the years 1946-1953 on a calendar year, accrual basis. The individual petitioner, Bessie Brouse Nelson (hereinafter referred to as "Bessie"), filed her Federal income tax returns for the years 1946-1953 on a calendar year, cash basis. Bessie's husband, Louis Nelson (hereinafter referred to as "Lou"), died October 10, 1946, and thereupon Bessie, who had owned 50 percent of the stock in the corporation, became its sole stockholder, and served as its president and treasurer at all times material hereto. During the years 1946-1952 (until October 1952 when she moved to the hotel) Bessie lived in Miami Beach, Florida, but made regular visits to New York and Brooklyn. During the period January 1, 1946, to October 31, 1952, Simon and Maude Slupsky (hereinafter referred to as "Cy" and "Maude," respectively) were the resident managers of the hotel and each received an annual salary of $2,400, plus a bonus amounting to from $600 to $1,500 per year. Neither of the Slupskys was an officer *131 or a director of the corporation during the years at issue. Maude was a niece of Lou. The Slupskys had taken the job in about 1942 at Lou's request, Lou also giving them a $3,000 gift as well as a rent-free apartment for Maude's mother (Belle Tuller) as inducements. The Slupskys also received a rent-free apartment during their tenure as managers and thereafter until they left the hotel on December 4, 1952. The hotel had, in its earlier years, been operated as an apartment house with "permanent" tenants on a month-to-month basis, but owing to a general deterioration of the neighborhood, it assumed, around 1940, more the character of a transient hotel. About three and one-half of the seven floors were devoted to the transient trade. Both of the Nelsons spent considerable time about the hotel prior to Lou's death, directing Maude and Cy as to the operating procedures. The Slupskys acted as room clerks and were not told to require any of the guests to bring luggage or to present identification. The rentals were paid in advance. The same general instructions remained in effect after Lou's death, with Bessie at the helm. During the period of the Slupskys' management, Bessie sometimes *132 acted as room clerk herself. The Slupskys voluntarily left the employ of the corporation on October 31, 1952, after which time Bessie assumed an even more active role in management. Bessie and the Slupskys were on friendly terms until near the end of the next to last year in issue. Hotel Registration Procedure The Slupskys acted as room clerks during the day from 7 o'clock in the morning until 7 o'clock in the evening. Other parties served as room clerks at night. When guests registered, the clerk on duty would fill in a registration card or slip. On its main portion (which was unnumbered) he would indicate the following information: Date, room number, rate, time, and clerk's initials. Perforated stubs attached to these cards were numbered and had blanks for the date, room number and rate, which information the clerk would also insert. When the guest completed registration, the complete card and cash would be placed in a drawer behind the registration desk. The guests were not given a receipt. When the Slupskys were finished at about 7:00 P.M. they would take these daytime rental cards (including the stubs) with the corresponding cash into their apartment and keep both in *133 a cigar box there. The night clerks followed the same registration procedure. However, at night (during all the years in issue) the transient rooms were re-rented, often several times per night. In such case when a second guest was registered for the same room, the second card would be placed in the drawer but the first card would be removed therefrom and placed in a manila envelope as Bessie had directed. These extra cards in the manila envelope, together with all daytime cards, were known as "re-hashes." The clerk on duty always kept at his desk a separate pad on which the numbers of all the transient rooms were listed. Next to each number the clerk would place a symbol to indicate the status of the room: "R" when the room was rented and currently in use; "O" when the room had already been used and the guests had departed (this symbol would inform the maid that the room had to be cleaned in preparation for the next guests); when no symbol was indicated or the "R" and "O" were crossed out the clerk knew that the room was clear and again ready for occupancy. This pad was used solely for the purpose of informing the hotel employees of the status of the transient rooms and was destroyed *134 after each day's use. It played no part in the preparation of the reports described below. Reporting Procedure When Cy began work in the morning the manila envelope containing the nighttime "re-hashes" was left for him in a cubby-hole behind the desk. The registration cards for the last of the night rentals of each room were left for him in the drawer. Cy would first prepare in duplicate a daily report of the "regular" cards - i.e., those cards still in the drawer, reflecting the last of the night rentals for each room. The cash corresponding to these rentals was regularly deposited in the corporation's account at the Lafayette National Bank. The carbon copy of the "regular" report (hereinafter called "regular" report as distinguished from "re-hash" report) and the duplicate of the deposit ticket were mailed daily to the office of the corporation's accountant located elsewhere in Brooklyn. The registration cards reflected on this "regular" report were also mailed to the accountant but the perforated stubs (containing the registration numbers) were first removed. This method of reporting to the accountant was in accordance with the system first devised by Lou and the accountant *135 (prior to the years at issue) as varied with the tacit approval of the latter. The accountant never went to the hotel to verify the accuracy of the system. The reports sent to the accountant's office thus did not bear any registration numbers, and the accountant could, and did, check the report only to the extent of checking the arithmetic on the report and comparing the total shown on the report with the amount deposited. These reports were sometimes in Bessie's handwriting. From these reports alone the corporate receipts for income tax purposes were determined. [2]
The originals of the "regular" reports and deposit slips together with the perforated stubs removed from the corresponding "regular" registration cards were daily forwarded to Bessie in accordance with her directions. Each morning Cy also picked up the manila envelope containing *136 the nighttime "re-hash" cards and took it into his apartment. The cash corresponding to these and the daytime "re-hash" cards was not deposited along with the "regular" money but was kept with the cards in the cigar box in the Slupskys' apartment. Later, either Cy or Maude would prepare, in duplicate, the "re-hash" report on which was recorded (1) the daytime receipts which the Slupskys had taken in at 7:00 P.M. the previous evening, and (2) the nighttime extra-rentals (i.e., all but the last rental which was listed on the "regular" report). Thus there was no overlap between the rentals listed on the "regular" reports and those on the "re-hash" reports. These "re-hash" reports indicated the cards' registration numbers in the column headed "clerk," but such numbers were not consecutively arranged. Thereafter, as Bessie had directed, the Slupskys would mail to her each day the original of the "re-hash" reports, keeping the carbon copy for themselves. The Slupskys also mailed to Bessie (1) the registration cards with stubs attached for the "re-hash" rentals; and (2) the detached stubs from the "regular" registration cards. On the Sunday "re-hash" report, the Slupskys would prepare *137 a weekly summary including the results from Monday to Sunday, inclusive. Before mailing the Sunday report on Monday morning, Cy would take the "re-hash" cash (usually in small bills) and have it changed into currency of larger denominations. Then Cy would come home and one of the Slupskys would count the money and mail it (in large bills) to Bessie at a Miami Beach address together with the other material sent daily to Bessie, as described above. The Slupskys would then put their retained carbon copies into a valise kept under their bed. It was from this valise that they produced the "re-hash" reports turned over to respondent's agents. Occasionally, when Bessie contemplated going to New York or had to pay debts there she instructed the Slupskys to hold or pay out the "re-hash" money for her instead of mailing it to Florida. Thus, Bessie received a part of the "re-hash" cash in New York and also (acting through the Slupskys) used parts of it as follows: (1) Paid $50 to Maude's mother; (2) deposited $500 in her personal account; (3) had a diamond ring reset at a cost of $1,410; (4) paid $1,000 due on the purchase of a mink stole; and (5) purchased a mink coat at a cost of $2,752. *138 Cy received a 1 percent "commission" on "re-hash" money. He usually received this in cash when he went to Florida in March or April of each year but received his final payment for 1952 by Bessie's personal check. Post-Slupsky Period After Bessie started to manage the hotel personally in October 1952, the re-rental of rooms and the use of the manila envelope procedure was continued under Bessie's directions and Bessie herself spent more time behind the desk, supervised the operation of the hotel and prepared most of the "regular" reports. The "re-hash" registration cards and cash were then turned over directly to Bessie. The hotel was generally busiest on weekends and guests often had to wait in the lobby for a room. Bessie's room in the hotel was near the lobby and she had to go through the lobby to leave or enter the hotel. Maids worked at night as well as in the day. On the night of February 6, 1953, the New York Police Department conducted a raid on the hotel and there were at least five unmarried couples found on the premises. There had been several re-rentals of rooms on the night of the raid. Bessie was acquitted of criminal charges arising out of the raid. After the *139 raid and resulting publicity business became rather slow for some time but there were still some re-rentals. Respondent's Investigation and Methods Agents of the respondent learned of this raid through an article in a local newspaper and immediately commenced a routine investigation of the corporation's tax returns. Cy, who had previously resigned and left the hotel premises, learned of the raid in the same manner and discussed it with one of respondent's agents whom he knew. The agent advised Cy that an investigation of the corporation was already in progress and that it would be wise for Cy to go to the Internal Revenue Service to explain what he knew about the operation of the hotel. Accordingly, on February 25, 1953, Cy went to the Service office and told about the "re-hash" procedure. About three weeks later Cy turned over the valise containing the "re-hash" reports to respondent's agents. Cy and Maude had numerous subsequent interviews with various agents of respondent. About October 1953 the case was referred to the Intelligence Unit and in March 1954 a special agent entered the case. In September 1955, Cy made two sworn statements (in question and answer form) before the *140 Service. At the same time, at the suggestion of respondent's agent Cy applied for an informer's reward - the application is still on file pending the conclusion of this proceeding. The "re-hash" reports appeared authentic to the agent when he received them in 1953 and thus, after test-checking several of them he decided to use them as a basis for computing the rentals of the hotel which were not reflected on the corporate books. These "re-hash" reports were made at the time of the events indicated thereon, are accurate (with the exception of the times noted thereon), and are authentic. They reveal the following "re-hash" receipts for the years in issue: Received by Corporation and Bessie *
1946
$ 28,805.00 (a) (b)
1947
33,621.20
1948
35,309.70
1949
35,126.95
1950
34,572.30 (c)
1951
32,546.25 (c)
1952
28,690.30 (c) (d)
1953
4,704.68 (c) (e) (f)
$233,376.38
(a) Since "re-hash" reports were available only after September 15, 1946, the agent determined the 1946 "re-hash" total by comparing the total receipts for the period September 15 to December 31, 1946, with *141 receipts for the similar period in 1947 and multiplying the ratio so obtained by the 1947 total receipts. (b) Respondent charged Bessie with 5/6ths of this amount in 1946, or $24,004.14 on the theory that Bessie had received the "re-hash" money only since March of that year when Lou became ill. (c) Respondent also added to Bessie's income the following amounts as corporate expenditures deemed personal: 1950 - $764.89; 1951 - $669.88; 1952 - $735.86; 1953 - $1,547.09. No fraud is alleged with respect to these amounts. (d) For the year 1952, there were no "re-hash" cards after October 26. For the period October 27-December 31, the agent used the unreported income for the same period in 1951. (e) For the year 1953, there were no "re-hash" reports available. The agent computed unreported income for this year by comparing laundry expenses in 1953, with those in 1952 and applying the ratio thus obtained to the unreported income for 1952 (as determined in note (d), supra). (f) The deficiency notice originally added an additional $14,900 to the corporation's unreported income as unexplained deposits but respondent now concedes that such sum does not represent income. None of these *142 receipts was reported on Bessie's individual returns. To support the above figures so based on the Slupsky "re-hash" reports and estimated projections thereof, respondent made independent checks on the accuracy of these reports. One method of verification employed was the comparison of the opening and closing registration numbers for the periods indicated below and the determination from such comparison of the number of registration cards apparently used. Such cards were then accounted for as follows: Total
Not
Cards Used
accounted
(to be
for on
accounted
"Regu-
Regular
"Re-
Unaccounted
for)
lars" *
Reports
hashes"
for
1950
19,366
10,216
9,150
8,064
1,086
1951
18,244
9,810
8,434
7,523
911
1952 (to Oct. 26)
13,385
7,828
5,557
5,260
297
Sometimes the registration numbers on the cards were not consecutive and some cards were voided. The voided cards were sent down to Bessie in Florida as she required that every number be accounted for. A second method of corroboration was the determination of the total number of sheets and face towels used by the hotel *143 and the comparison of these totals with the number of sheets and towels used in rooms included in the "regular" reports. Each permanent guest usually received 4 face towels and 2 bed sheets per week; each transient, 2 face towels and 2 bed sheets. Respondent's determinations for the years 1950-1952 based upon the number of sheets and towels used in reported rooms as compared with net sheets and towels laundered, [3] the number of each that were thus unaccounted for and the number of sheets and towels required for unreported rooms (per "re-hash" reports) are as follows: Sheets Normally
Sheets Required
Provided to
Sheets
for Unreported
Total Sheets
Reported Tenants
Unaccounted
Rooms (per
Year
Laundered
and Guests *
For
"Re-hash"
Reports)
1950
40,735
23,612
17,123
16,128
1951
38,621
22,566
16,055
15,046
1952 (to Oct. 26)
29,478
18,284
11,194
10,520
Face
Face
Towels Normally
Towels Required
Total
Provided to
Face Towels
for Unreported
Face Towels
Reported Tenants
Unaccounted
Rooms (per
Year
Laundered
and Guests *
For
"Re-hash"
Reports)
1950
41,080
26,168
14,912
16,128
1951
37,412
24,888
12,524
15,046
1952 (to Oct. 26)
29,658
20,396
9,262
10,520
*144 Scope of Pleadings In his original answer in both dockets, respondent alleged fraud in that the respective petitioners failed to report monies received from re- rental of rooms. At the opening of the trial, respondent, in response to the petitioners' motions for better statements, filed amended answers which alleged fraud in petitioners' failure to report rental income (including therein rentals from the penthouse). Petitioners in both dockets then filed amended replies denying fraud in the reporting of rental income. Ultimate Fact Both petitioners failed to report income for the years 1946-1953, inclusive; the failure for the years 1946-1952, inclusive, was due to defraud with intent to evade the tax. The failure in 1953 was not due to such fraud. Penthouse Rents On the seventh floor of the hotel was a penthouse, built originally to benefit Lou's health. During the years in issue it was occupied by Irma Moore. Irma paid $60 per month rent by checks drawn to *145 the order of the corporation. These checks were not reflected on the corporate books or returns but were deposited to various accounts of Bessie or "Bessie Nelson in Trust for Burton M. Nelson" (Bessie's son by her marriage to Lou, hereinafter referred to as "Burton") or were first deposited in the corporation's account and then the money withdrawn and mailed to Bessie in Miami Beach. The corporation paid all the penthouse expenses. Bessie did not report the penthouse rents on her individual returns. Ultimate Facts The rents were income to the corporate petitioner but its failure to report same in 1953 was not due to fraud with intent to evade the tax. [4]
Bessie's failure to report the penthouse rents for the year 1953 was not due to fraud with intent to evade the tax. [4]
Burton Nelson Trust ("Nelrach" Trust) [5]
Under the terms of Lou's will, *146 his stock in Nelrach Theatres, Inc., was bequeathed in trust to Bessie and Phil Meyers as trustees, to use the income for the education and maintenance of his and Bessie's son, Burton. During the fiscal years ending September 30, 1947, to September 30, 1951, Bessie, as executrix of Lou's estate, filed income tax returns for it and there reported the Nelrach dividends. Upon the settlement of Lou's estate in 1951, the stock was transferred to the testamentary trustees who filed income tax returns for the fiscal years ending September 30, 1952, 1953, and 1954, and there reported all dividends earned on Lou's stock in Nelrach. All dividends earned on Nelrach stock were deposited in savings accounts styled "Bessie Nelson in Trust for Burton M. Nelson." On October 27, 1948, Bessie purchased a life insurance policy from Gulf Life Insurance Company, insuring her life for the face amount of $103,580 at an annual premium of $3,269. Burton was named beneficiary and Bessie intended that he be irrevocable beneficiary with full ownership rights. Inadvertently, the policy gave the ownership rights to Bessie but by rider in 1954 full control over the policy was given to Burton. For the years *147 1948-1953, inclusive, these premiums were paid by Bessie from the Nelrach trust. The trust also paid the following premiums on endowment insurance policies issued by Franklin Life Insurance Company on Burton's life with Bessie as beneficiary under terms set forth below: Years
Years Premiums
Policy No.
Issued
Premium
Paid
836832
1949
$1,005
1950-1953
868929
1949
670
1950-1951, 1953
1030383
1951
710
1951, 1953
Bessie was the applicant on each policy. Each policy contained the following provisions: CONTROL OF POLICY (1) This Policy is a contract between the Company and the person designated in the application as "Applicant". Until the Insured shall have attained the age of 21 years, the Applicant shall have the right to exercise every option, benefit and privilege provided for in this Policy without the consent or joinder of the Insured or of any Beneficiary. (2) When the Insured shall have attained the age of 21 years, said Insured shall have the right to exercise every option, benefit and privilege provided for in this Policy without the consent or joinder of the Applicant or of any Beneficiary. Burton attained the age of 21 years *148 on June 2, 1958. Bessie was not, in substance, the owner of the trust property. Opinion Unreported Income - Rooms Other Than Penthouse. The basis for respondent's determination of petitioners' unreported income (from rooms other than the penthouse) is the so-called "re-hash" reports prepared by the Slupskys. The reports in evidence cover the period September 15, 1946, to October 26, 1952, and reveal unreported rental income in amounts indicated in our findings. The income for the periods January 1, 1946, to October 25, 1946, October 27, 1952, to December 31, 1952, and the entire calendar year 1953 was determined by projection of the income indicated on these reports. Petitioners have pleaded the three-year statute of limitations (section 275(a)) as a bar to the assessment of these deficiencies for the years 1946-1948, inclusive. The statutory bar is inapplicable if the returns for these years were false or fraudulent with intent to evade the tax. Section 276(a). The statute of limitations has not been pleaded as to the years 1949-1953, inclusive. The defects in the "re-hash" reports were relatively slight [6] and, if anything, support rather than destroy our firm conviction *149 that they are authentic. The figures in footnote 6, together with our personal observation of the reports and the agent's description of their condition in 1953 (when they were first placed in his custody), and the testimony of the Slupskys satisfy us that they are authentic and were made contemporneously with the transactions which they depict. With correction for the insignificant errors noted at trial, we sustain respondent in his determination of unreported rental income for the years indicated by the "rehash" reports. We also find abundant support in the record for respondent's determination that the receipts were income both to the corporation and through it, to Bessie. Cf. United Dressed Beef Co., 23 T.C. 879 (1955). *150 We further approve respondent's determination that, although Lou did not die until October 10, 1946, Bessie is properly chargeable with 5/6ths of the 1946 income forwarded by the Slupskys. The record reveals that Lou was paralyzed beginning in March of that year and Bessie was then already active in his affairs. For the periods January 1 to September 15, 1946, and October 29 to December 31, 1952, no "re-hash" reports were available to respondent, consequently he determined unreported income (apart from penthouse rentals) by comparison to like periods for the years 1947 and 1951, respectively. For the year 1953 he determined the amount by comparison of the laundry bills for that year with those for 1952. While these methods are undoubtedly imperfect from an accounting standpoint, we feel they are well within the necessarily wide range of discretion accorded the respondent by statute [7] in determining income where books are inadequate and the impossibility of a more precise income determination is attributable to shortcomings of taxpayer himself. See e.g. Yorkville Live Poultry Co., 18 B.T.A. 47 (1929), and Maurice Cross, 24 B.T.A. 1079 (1931) (among many *151 cases determining net income by applying an established industry profit percentage to gross income); United Dressed Beef Co., supra (determining excess receipts by multiplying estimated average over-ceiling price per pound by number of pounds of beef sold); and Dorothy L. Sutherland, 32 T.C. 862 (1959) (estimating waitress' tips on basis of food sales).
It is also clear that respondent could resort to a method divorced from the books and records produced (i.e., the "regular" reports), even though they may have been internally consistent, to determine whether such books and records clearly reflect income. Morris Lipsitz, 21 T.C. Holland v. United States, 348 U.S. 121 (1954); *152 Harry Gleis, 24 T.C. 941 (1955), affd. 245 F. 2d 237 (C.A. 6, 1957). This principle is particularly applicable here because the corporate account, not having received the stubs, had no means of auditing to determine whether all cards had been submitted to him and therefore he could not verify the amount of receipts reported to him and reflected on the returns. The likelihood of omission was thus great, especially as the business of the corporation was transacted in cash. See Harry Gleis, supra. Nor do we understand MacCrowe's Estate v. Commissioner, 264 F. 2d 621 (C.A. 4, 1959), reversing 30 T.C. 653, to prohibit such a method of proof for there we did not accept for computation of the deficiency the respondent's showing of the number of morphine tablets used. (The figure was there offered to form a basis for determining the number of abortions performed by the taxpayer-physician.) Likewise, we sustain respondent's comparison for the years 1950-1952 of: (1) The number of registration cards which the numerical sequence indicated had been used with the number of cards reflected on the "regular" reports; and (2) amount *153 of laundry used as indicated by the invoices with that normally used in the rooms included on the "regular" reports. Both these comparisons pointed to substantial understatement of rentals and corroborate the already well supported and indeed, unchallenged, finding that the "regular" reports failed to reflect all the rentals. In an attempt to show that Bessie's determined receipts from the corporation could not have been dividends, petitioners' argument is based on the book figure for opening earned surplus which was about $500. The agent would not accept this figure as he did not have any of the earlier returns. We approve the agent's action and observe that our distrust for this figure is supported by our observations concerning Bessie's credibility (discussed below). It is further supported by our total disbelief of the corporate accountant based on our observations of his demeanor on the stand and the evasiveness of his answers together with his total indifference toward his inability to verify the accuracy of the corporate reports submitted to him. Accordingly, we do not give any credence to this figure. Petitioners cite no case or ruling relieving them of the burden (except *154 as to fraud) of establishing the amount of earnings and profits at a particular time. Unreported Income - Penthouse Petitioners argue that the penthouse was constructed and owned by Lou in his own name and was not an asset of the corporation. The corporate returns which were in evidence simply reflect one figure as "cost or other basis" of the building, acquired in 1926, and the corporate accountant testified that they have done so since he began his services with the corporation in 1934. Since "cost or other basis" might well (and indeed, should) include additions to the building, we find no support for the conclusion that the penthouse cost was not reflected on the corporate books or that the corporation never took depreciation thereon. In any event, the evidence is uncontradicted that Irma paid her rent checks to the corporation and that the corporation paid all the operating expenses of the penthouse. This would strongly suggest that, even if the penthouse was originally built by Lou, it later became the property of the corporation. Furthermore, petitioners' only effort to prove that the penthouse was built by Lou with his own personal funds was through the testimony of *155 a former 50 percent stockholder and officer of the corporation. On cross-examination this witness was shown to be completely uninformed about and unfamiliar with the corporate books, depreciation, or the handling of corporate accounts and finances. Admittedly, her recollection of all pertinent details was hazy since it related to events happening approximately 30 years earlier. We feel her unsupported conclusion, as above, is entitled to little weight. We accordingly hold that the penthouse rentals were income to the corporation as well as to Bessie. The amounts of these rentals are not in dispute. Embezzlement Loss Petitioners' broad theory of defense as to the "re-hash" rental receipts is that while the corporation received monies beyond those reflected on the "regular" reports, such monies were embezzled and retained by the corporate agents, the Slupskys, and thus the corporation is entitled to a corresponding deduction in the amount of its unreported income for each year. It would necessarily follow from this that there was no income to Bessie. This theory is admittedly an affirmative defense, is inextricably tied in with the fraud issue, and for reasons elaborated in *156 our opinion under that heading we feel that petitioners' proof is woefully deficient as to the occurrence of any embezzlement. Fraud (1946-1952, inclusive) Respondent has determined that for all the years here at issue, petitioners' failures to report substantial amounts of income were due to fraud with intent to evade the tax. On this, of course, respondent bears the burden of proof, and must establish this proof by clear and convicing evidence. M. Rea Gano, 19 B.T.A. 518 (1930). In this case the question is principally one of credibility and we must choose between two diametrically opposed lines of testimony. Doggett v. Commissioner, 275 F. 2d 823 (C.A. 4, 1960), certiorari denied 364 U.S. 824 (affirming a Memorandum Opinion of this Court). Bessie, on the stand, professed complete ignorance of her husband's business affairs in general and of the corporate operating procedures in particular. She asserted that as late as September 1952 she was unaware of the use of the manila envelope and that when she finally learned of it she assumed that the envelope was kept to avoid police detection of the re-rental of rooms. This position has some *157 merit, if believed. See Morris Nemmo, 24 T.C. 583, 595-596 (1955), reversed on another issue sub nom. Polizzi v. Commissioner, 247 F. 2d 875 (C.A. 6, 1957). However, we observed Bessie on the witness stand for eight days and have considered her admitted participation in business dealings both before and after Lou's death; her possession of a power of attorney on Lou's behalf prior to his death; her regular consultations with the corporate bookkeeper; her frequent visits to the hotel and her residing at the hotel after October 1952; her hiring and instructing of employees; and her admitted purchasing of furniture for the hotel. Furthermore, we have taken into account her manifest contradictions in explaining (1) her own cash transactions and business dealings; (2) her participation in the management of the hotel; (3) her relations with the Slupskys. We are convinced that Bessie's naivete is not as extensive as she would have us believe. To the contrary, she impressed us as being alert, quick-witted, and sophisticated in business matters, and we do not believe she misunderstood the purpose of the envelope. We are not unmindful of the circumstance that the *158 Slupskys are informers who stand to benefit by, perhaps, as much as 10 percent of the taxes and additions thereto ultimately collected by the Government. See section 301.7623-1(c), Income Tax Regs. However, we have studied the circumstances leading up to Cy's assisting respondent's agents. They satisfy us that Cy visited respondent's office because encouraged to do so by one of respondent's agents. We are supported in this belief not only by the testimony of another agent but also by the proximity in time between the police raid of the hotel (February 6, 1953) and Cy's first visit (February 25 of the same year). It is also significant that the reward was not claimed until September 1955, well after the papers had been surrendered to the agents; even then, the reward was claimed only at the agent's suggestion. Furthermore, the entire record, including a series of Bessie's own letters which contradicts her testimony in numerous particulars, establishes that Bessie and the Slupskys were related by marriage and were on very friendly terms until at least October 1952. Thus, while we do not entirely disregard the Slupskys' financial stake in the outcome of *159 this proceeding, we cannot give it the significance petitioners desire and we do not agree that the Slupsky participation and testimony were prompted by motives of self-protection, spite and revenge. Nor are we impressed by petitioners' assertion that the Slupskys were "confessed co-conspirators in the alleged scheme" for it is clear, even by Bessie's own admissions, that the Slupskys knew nothing about the preparation of either the corporation's or Bessie's financial records or tax returns. To the contrary, it would seem that if the Slupskys were co-conspirators with knowledge of the nonreporting of the "re-hash" receipts on the returns of ether petitioner (and were thus liable to prosecution for felonies under section 145(b)), Cy would have been most reluctant to go to respondent's offices and produce reports in the Slupskys' own handwriting. The Treasury's voluntary disclosure policy had been publicly abandoned January 10, 1952, Treasury Press Release S-2930, and there is no indication of any promise of immunity to the Slupskys. Accordingly, we refuse to discredit the Slupsky testimony. In any event, all the employees of the hotel who testified corroborated the Slupsky story *160 which unequivocally implicates Bessie in the "re-hash" scheme and attributes the manila envelope procedure to her express instructions. One of these employees testified that he was disciplined by Bessie on an occasion when he inadvertently put a second card in the drawer and failed to remove the earlier card and place it in the manila envelope. We feel that it is unthinkable that Bessie would have stood idly by through all the years in issue without taking affirmative action had the "re-hash" monies failed to reach her. Her much belated filing of suit against the Slupskys on January 29, 1959 (just prior to the trial in the instant proceeding), is an obvious self-serving afterthought. The record does not indicate whether the suit has been further prosecuted. We attach no significance to it. In their effort to discredit the Slupskys, to disprove the testimony that the "re-hash" money was mailed to Florida, and to establish the embezzlement loss, petitioners have attempted to show increases in the Slupskys' net worth inconsistent with their income and expenditures. Their theory is that, if comparison of these statements reveals large unexplained increases in the Slupskys' net worth *161 plus nondeductible expenditures, we will be able to infer (and we agree that under such circumstances we should so infer for purpose of deciding the existence of fraud by the petitioners) that these increases were the proceeds of embezzlement by the Slupskys of corporate funds. The crucial figure in this analysis is the opening cash on hand figure for January 1, 1946, which respondent sets at $15,500. We believe this figure to be well supported by the record [8] and, if anything, an underestimate. Their subsequent increases in savings account balances are entirely consistent with their earnings, personal living expenses, and decreases in cash on hand. *162 Having observed the Slupskys' demeanor on the stand, we believe their perfectly plausible story that in the late 1940's they began depositing large sums of their cash on hand because the increasing number of burglaries in the neighborhood made them apprehensive about keeping large sums in their apartment. With the crucial starting net worth figure established, and bearing in mind that their apartment was rent-free during these years, we also find their over-all increase in net worth of about $20,000 for the 1946-1953 period to be a figure entirely consistent with their thrifty standard of living attested to by numerous witnesses. [9] Certainly this figure does not even remotely suggest embezzlements averaging roughly $30,000 per year. Cf. Doggett v. Commissioner, supra, at p. 825. Petitioners next point to two large deposits made by the Slupskys, of $7,000 in July *163 1956 and $15,000 in August 1957, suggesting that these show other Slupsky assets not included in the above net worth analysis. These deposits have been satisfactorily explained by Cy as repayments of monies by his nephew, Sallman, which were part of $24,000 given to Sallman in 1952 for the purpose of investing in real estate. This story is corroborated by Cy's large withdrawals from savings accounts in 1952 of approximately the same amount. [10] It is further supported by the forthright and well documented testimony of Sallman who stated that he received the money in 1952, held it for several years while looking for investment opportunities, then repaid it, mostly in 1956 and 1957. We accordingly hold that there was no embezzlement, and that respondent has established by clear and convincing evidence that no "re-hash" money was converted by the Slupskys and that it was all forwarded to Bessie. We are also impressed by the circumstance that the final 1 percent commission check to Cy (for 1952), in the amount of $161.26, was given on a personal check of Bessie, although *164 she always had corporate checks in her possession. Bessie's assertion that this check was for repairs to the hotel becomes truly incredible when we consider that the amount of the check corresponds exactly with the figure shown as due from Bessie in a small, longhand notebook or diary which Cy kept for his own information and which he turned over to respondent by 1954. In this book he recorded "re-hash" money turned over to Bessie and the 1 percent commission computed thereon. Our study further reveals that the "re-hash" reports for the period March 10, 1952, [11] to October 31, 1952, totaled $16,156 (odd cents excluded). This is only $30 different from the amount shown in Cy's book ($16,126) on which the 1 percent commission was computed. For the years 1946-1952, the omissions of "re-hash" income were so large and consistent, both relatively and absolutely, by both petitioners, that we feel they were obviously not attributable to inadvertence, but rather bespeak of a deliberate pattern of understating income for the purpose of avoiding the payment of income *165 taxes. M. Rea Gano, supra; Arlette Coat Co. 14 T.C. 751 (1950). Further support for this conclusion, if indeed any be needed, may be found in the double set of records (regular and "re-hash") kept at Bessie's directions. Spies v. United States, 317 U.S. 492, 499 (1943). See also, Jack M. Chesbro, 21 T.C. 123 (1959), affd. per curiam 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956). We are also justified in considering the strong motive to conceal income because it arose from an operation which was rather unsavory and eventually prompted the positive action of the New York Police Department. Commissioner v. Smith, 285 F. 2d 91, 98 (C.A. 5, 1960) (affirming a Memorandum Opinion of this Court). Though respondent has made some effort to prove fraud by the so-called "cash expenditure" method, he has failed to negate the existence of available resources from which Bessie might have made certain large cash expenditures. Thus, we do not draw our inferences of fraud from the circumstances of Bessie's large expenditures. Nor, in view of our holding for these years, have we deemed *166 it necessary, for the 1946-1952 period, to decide whether there was fraud by either petitioner in the failure of either to report the penthouse rentals. Our decision on this issue makes the statute of limitations inapplicable as a bar to assessment of deficiencies for the years 1946-1948, inclusive. Section 276(a). Fraud (1953) As to the year 1953, the understatement alleged is considerably smaller than for other years at issue and has been determined by respondent under an altogether different method. While we had no difficulty accepting and sustaining this method on the deficiency issue alone, we do not feel that it furnishes the high quantum of proof which respondent must adduce to establish fraud. It is quite possible that laundry rates may have risen to an undetermined extent in 1953 and, to begin with, the comparison of laundry bills of two years is at best a rather rough and imprecise way of determining the relationship between the receipts of the two years. Furthermore, we have credible testimony that business, for obvious reasons, became much slower after the police raid in the early part of 1953. Thus, respondent's case for 1953 is reduced to one of mere suspicion and, *167 as has been repeatedly stated, this is not enough assurance to enable us to find fraud. Drieborg v. Commissioner, 225 F. 2d 216 (C.A. 6, 1955), affirming on this issue a Memorandum Opinion of this Court. Nor do we feel respondent's case is strengthened when we consider the unreported penthouse rentals. As to the corporation, Roselle Posner, the former officer of the corporation, testified that she believed the penthouse was owned by Lou personally. While we found her belief to be totally unsupported, we cannot say that she did not honestly entertain this belief and communicate the idea to Bessie. We thus exonerate the corporation from charges of fraud in failure to report penthouse rentals. As to Bessie's failure to report the penthouse rental we do not believe that this comparatively small understated amount, by itself, does anything more than create a further suspicion, and we feel that Bessie is thus entitled to the benefit of the doubt. We must also remember that a raid occurred and an investigation of the corporate tax affairs commenced in 1953 and agents interviewed Bessie soon thereafter. Hence, we cannot necessarily assume that Bessie's earlier scheme or plan *168 was carried through in reporting 1953 income in 1954. Accordingly, we hold that petitioners' failure to report income in 1953 was not due to fraud with intent to evade the tax. Pleading Question Petitioners challenge our action of allowing respondent to file an amended answer in which he clarified his original position by stating that the fraud, on the part of both petitioners, consisted of failure to report rentals (his original answer alleged only failure to report "re-rentals"). We have used the term "clarified" rather than "changed" because as we view the original answer "re-rental" may well have meant all the rentals other than the last of the night rentals - i.e., the one included in the "regular" report. It did not necessarily, as petitioners assume, refer to a chronological order of rentals starting with the daylight hours. It was by no means clear that respondent's initial answer did not cover the possibility of unreported daytime as well as nighttime rentals. The amendment was thus within respondent's recognized power to amend his answer to correct possible misinterpretations of his allegations. W. H. Armston Co. v. Commissioner, 188 F. 2d 531, 534 *169 (C.A. 5, 1951), affirming 12 T.C. 539. However, we need not view the pleadings from so narrow a vantage point, for here petitioners' whole line of defense, in the pleadings, at trial, and on brief, was a general denial of Bessie's involvement in the scheme alleged by respondent. It was this involvement that petitioners sought from the outset to disprove. We thus find no merit in petitioners' claim of "surprise." It is well settled that the allowance of an amendment to an answer is a matter entrusted to our discretion, Jahncke Service, Inc. 20 B.T.A. 837, 846 (1930), and cf. Board of Tax Appeals v. United States, 37 F. 2d 442 (C.A.D.C., 1929), certiorari denied 281 U.S. 731 (1929). We recognize the serious nature of this case and are eager to prevent any unjust or unfair enlargement of petitioners' obligations at trial, but we cannot perceive how petitioners could have been misled here. Burton Nelson Trust Our reading of the policy on Bessie's life, together with the application which must be considered an integral part thereof, convinces us that Bessie never intended to have any incidents of ownership of this policy. The *170 policies on Burton's life, while conferring "ownership" upon Bessie during Burton's minority, were obviously intended for Burton's benefit since upon his attaining age 21, the ownership would automatically vest in him. Bessie merely acted as owner while Burton was a minor and clearly could have received any benefits of the policy only as trustee for Burton. Thus, as to all of the above policies, the income used for premiums was not vested in Bessie nor was it used for her benefit. The trust instrument did not give Bessie any such powers over the income and, in any event, there was a co-trustee who had to participate in all decisions as to use of the trust funds which the trust instrument clearly limited to Burton's sole benefit. We would do violence to the natural construction of both the policies and the trust created by Lou's will were we to glean therefrom any power in Bessie alone to vest either the corpus or income in herself or for her benefit. We thus hold that Bessie is not taxable under the so-called Clifford regulation [12] as, in effect, the owner of the trust property. *171 Section 294(d)(1)(A) and (d)(2) Additions Bessie offered no proof that her failure to file estimated returns for the years 1948, 1950-1953 was due to reasonable cause and not to willful neglect. We accordingly sustain respondent's determination of an addition under section 294(d)(1)(A) for those years. The 294(d)(2) addition for substantial underestimation for 1946, 1947 and 1949 may be computed in accordance with this opinion. A. E. Hickman, 29 T.C. 864, 878 (1958). Other issues have been settled by stipulation. Decisions will be entered under Rule 50. Footnotes
1. Unless otherwise noted, all Code references are to the Internal Revenue Code of 1939. a1 Respondent now concedes that the section 294(d)(2) additions to tax for substantial underestimation of income tax liability for the years indicated are improper. Commissioner v. Acker, 361 U.S. 87↩ (1959).
2. These reports also included the rentals, when received, from "permanent" tenants. With the exception of the penthouse rents, discussed, infra, there is no allegation of fraud or understatement with respect to "permanent" rentals, nor is it disputed that the books and returns correctly reflect the receipts as listed on the "regular" reports.↩
*. Includes $720 rent received from penthouse in 1946-1952 and $660 in 1953.↩
*. Based on number of "regular" rooms reported.↩
3. The incoming laundry was always checked against the laundry invoices and torn sheets and towels are taken into account.↩
*. Adjusted for rooms using more or less than regular number of sheets or towels.↩
*. Adjusted for rooms using more or less than regular number of sheets or towels. ↩
4. We have already found that there was fraud with intent to evade the tax on the part of both petitioners for the years 1946-1952, inclusive.↩
4. We have already found that there was fraud with intent to evade the tax on the part of both petitioners for the years 1946-1952, inclusive.↩
5. Fraud penalty not asserted.↩
6. Petitioner hired an independent certified public accountant to audit all the "re-hash" reports available covering the period September 15, 1946, to October 26, 1952. For this 2,234-day period there were 10 reports missing, Of the 2,224 present he found: No. of
"Defect" in Report
Reports
Torn
19
Corrections
17
Arithmetic Errors (in both directions
generally 50 cents, a dollar or two
dollars: net error $2.20)
35
71
The percentage of reports containing "defects" is 3.2 percent of the reports audited.↩
7. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *↩
8. Maude and Cy were both employed in the 1933-1942 period and Cy continued on his laundry route through 1943. Their standard of living was always frugal. Cy had $5,000 at the time of the Slupskys' 1933 marriage; they received at least $1,500 in wedding gifts from Maude's mother and Lou; Lou gave Maude a $3,000 gift for taking over the management of Kismet Arms in 1942; and Cy received about $6,500 from the sale of his laundry business in 1943. During the same period the Slupskys invested $825 in U.S. bonds and $5,013 (net) in various savings accounts.↩
9. Even were we to reject respondent's estimate of the Slupskys' opening cash on hand, the eight-year increase in net worth would still be only $35,500, an amount trifling in comparison to the approximately $30,000 per year (for the first seven years) in "re-hash" money received by the petitioners.↩
10. The $24,000 investment was then included as an asset on the net worth statement for December 31, 1952.↩
11. Cy's book, described above, reveals that he had previously been paid his 1 percent commission through March 9, 1952.↩
12. Regulations 118: Sec. 39.22(a)-22. Trust income taxable to person other than grantor. Where a person other than the grantor of property transferred in trust has a power exercisable solely by himself to vest the corpus or the income therefrom in himself, the income therefrom shall be included in computing the net income of such person. * * *↩